# EXHIBIT 1

S/ES-IRM Official Dep. Excerpts, Oct. 11, 2019



# Planet Depos
*We Make It Happen*

~~SUBJECT TO PROTECTIVE ORDER~~

# Transcript of ▮▮▮▮▮▮▮▮

**Date:** October 11, 2019
**Case:** Judicial Watch, Inc. -v- U.S. Department of State

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

SUBJECT TO PROTECTIVE ORDER

Transcript of [REDACTED]   1 (1 to 4)

Conducted on October 11, 2019

---

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - x
JUDICIAL WATCH, INC.,       :
        Plaintiff,           :
    v.                       :   Case No.
U.S. DEPARTMENT OF STATE,    :   14-cv-1242 (RCL)
        Defendant.           :
- - - - - - - - - - - - - - x
         SUBJECT TO PROTECTIVE ORDER

         Videotaped Deposition of
              [REDACTED]
              Washington, DC
          Friday, October 11, 2019
                 9:57 a.m.




Job No.: 262567
Pages 1 - 162
Reported by: Debra A. Whitehead
```

**Page 2**

```
 1  Videotaped Deposition of [REDACTED]
 2  [REDACTED] held at the offices of:
 3
 4      PLANET DEPOS - DC
 5      1100 Connecticut Avenue, NW
 6      Suite 950
 7      Washington, DC 20036
 8      (888) 433-3767
 9
10
11
12
13      Pursuant to notice, before Debra A. Whitehead,
14  an Approved Reporter of the United States District
15  Court and Notary Public of the District of Columbia.
```

**Page 3**

```
            A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
    LAUREN M. BURKE, ESQUIRE
    RAMONA COTCA, ESQUIRE
    JUDICIAL WATCH, INC.
    425 Third Street, SW
    Suite 800
    Washington, DC 20024
    (202) 646-5172

ON BEHALF OF DEFENDANT:
    ROBERT PRINCE, ESQUIRE
    STEPHEN M. PEZZI, ESQUIRE
    U.S. DEPARTMENT OF JUSTICE
    FEDERAL PROGRAMS BRANCH
    1100 L Street, NW
    Washington, DC 20005
    (202) 305-7583
```

**Page 4**

```
      A P P E A R A N C E S  C O N T I N U E D
ON BEHALF OF DEFENDANT:
    MICHAEL LIEBERMAN, ESQUIRE
    UNITED STATES DEPARTMENT OF STATE
    2201 C Street, NW
    Washington, DC 20520
    (202) 647-6371


ALSO PRESENT:
    JEREMY DINEEN, Video Specialist
```

SUBJECT TO PROTECTIVE ORDER

Transcript of ▇   2 (5 to 8)

Conducted on October 11, 2019

---

Page 5

C O N T E N T S

| | | PAGE |
|---|---|---|
| EXAMINATION OF ▇ | | |
| By Ms. Burke | | 7 |

E X H I B I T S
(Attached to the Transcript)

| DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | E-mail String | 39 |
| Exhibit 2 | E-mail String | 56 |
| Exhibit 3 | Federal Bureau of Investigation FD-302a, Bryan Pagliano | 74 |
| Exhibit 4 | 3/17/09 E-mail from Purcell Lee to ▇, et al. | 103 |
| Exhibit 5 | E-mail String | 110 |
| Exhibit 6 | E-mail String | 114 |
| Exhibit 7 | Office of the Secretary: Evaluation of Email Records Management and Cybersecurity Requirements | 138 |

---

Page 6

PROCEEDINGS

VIDEO SPECIALIST: Here begins Disk Number 1 in the videotaped deposition of ▇ ▇ in the matter of Judicial Watch, Inc., V. U.S. Department of State; in the United States District Court for the District of Columbia; Case Number 14-CV-1242.

Today's date is October 11, 2019. The time on the video monitor is 9:57. The videographer today is Jeremy Dineen, representing Planet Depos. This video deposition is taking place at the offices of Planet Depos, at 1100 Connecticut Avenue, Northwest, in Washington, DC.

Would counsel please voice-identify themselves and state whom they represent.

MS. BURKE: Lauren Burke, representing Judicial Watch.

MS. COTCA: Ramona Cotca, on behalf of Judicial Watch.

MR. PRINCE: Robert Prince, on behalf of State.

We reserve the right to -- to read and

---

Page 7

sign.

MR. PEZZI: Stephen Pezzi from the Department of Justice, on behalf of defendants.

MR. LIEBERMAN: Michael Lieberman with the Department of State.

VIDEO SPECIALIST: The court reporter today is Debbie Whitehead, representing Planet Depos.

Would the reporter please swear in the witness.

▇ having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MS. BURKE:

Q   Good morning.
A   **Good morning.**
Q   Before we start, if you could just say and spell your name, for the record.
A   **Sure.** ▇
It's ▇
▇ And then it would be ▇

---

Page 8

Q   Great. Thank you.
And have you ever been deposed before?
A   **No.**
Q   You have not? Well, welcome to the fun.
A   **Uh-huh. Check.**
Q   It's pain -- relatively painless. I'm going to just go over a couple of general rules --
A   **Okay.**
Q   -- for deposition purposes.
So you were just sworn in. And I just want to make sure that you understand that you are required to tell the truth, you're under oath today.
A   **Uh-huh.**
Q   And just because we are setting a record, if you could make all of your answers and responses verbal.
A   **Yes.**
Q   She's unable to pick up a nodding of the head.
A   **Understood.**
Q   And because it is being transcribed, in

---

SUBJECT TO PROTECTIVE ORDER

Transcript of [REDACTED]  3 (9 to 12)
Conducted on October 11, 2019

---

9

1  order to create sort of a clean record, we do want
2  to make sure that we're not talking over one
3  another.
4      So even if you can anticipate or you
5  think you may know where the -- the question is
6  going, just let me finish the question. And then
7  I'll do the same with you and make sure, try not
8  to interrupt your answer until it's been fully
9  provided.
10  A   I understand. May I give you permission
11 if I do interrupt, to just stop me.
12  Q   Okay. Thank you.
13     And if -- I'm going to try and be as
14 clear as possible. If I -- if there's any
15 questions that I have -- that you don't understand
16 or you need clarification on, please don't
17 hesitate to ask me that.
18  A   Okay.
19  Q   And your -- and your attorneys may object
20 at certain points. We'll let them get their
21 objection on the record. And then, but,
22 regardless of that, you can go ahead. Unless they

10

1  instruct you not to answer the question, you may
2  go ahead and -- AND proceed with answering the
3  question that was asked.
4  A   Okay.
5  Q   And if at any time you need a break, if
6  you want to use the restroom or you just need to
7  stretch your feet or talk to your lawyers, just
8  don't hesitate.
9      In preparation for today's deposition,
10 other than your attorneys, did you have an
11 opportunity to review any documents or speak with
12 anybody about today's deposition?
13  A   No, ma'am. All I had today was the prep
14 with my attorneys. That's it, no other.
15  Q   And are you familiar with the case that
16 you're here for this deposition?
17  A   Generally is -- I'm familiar. I
18 understand. They told me what -- why I'm here.
19 Other than that ...
20  Q   And sort of generally, this is -- it's a
21 case, a FOIA request --
22  A   Uh-huh.

11

1  Q   -- served by Judicial Watch on the State
2  Department.
3      It was related specifically to
4  communications about talking points for the 2012
5  Benghazi attacks. Have you reviewed any documents
6  that are from this case specifically? Maybe other
7  witnesses' testimonies or deposition?
8  A   No, ma'am.
9  Q   Okay. With that sort of out of the way,
10 if you could, for the record and for -- for
11 myself, provide a little background of your
12 experience and expertise?
13     MR. PRINCE: Objection. Form.
14  A   My expertise is what I do at the
15 Department of State. May I -- yeah.
16  Q   Yes.
17  A   I am -- I am -- currently, I work for
18 what's called exec tech, which is the information
19 technology and data sciences pieces of the
20 Executive Secretary, who supports the Secretary of
21 State, the Office of the Secretary of State
22 direct.

12

1      In 2009 I was -- we were a little
2  different back then. And [REDACTED]
3  [REDACTED] for the Executive
4  Secretary's IT shop, called S/ES-IRM.
5  Q   And that was in 2009?
6  A   Yes.
7  Q   And --
8  A   Before it evolved. Does that make sense?
9  Q   Sure.
10  A   Uh-huh.
11  Q   Are you -- is your position relatively
12 the same? It's --
13  A   Relatively? Sure. In the -- in the
14 vague -- yes, it's rel -- we -- we do more than
15 just IT today. Data sciences that are being
16 employed, user design, user experience, these are
17 all things that we've added to it while we've
18 rebranded, yes. So, but are the core things of
19 technology and -- yes, those are still embedded in
20 core to our services.
21  Q   And you said that your position was
22 you're [REDACTED]?

~~SUBJECT TO PROTECTIVE ORDER~~

Transcript of ▮ 4 (13 to 16)
Conducted on October 11, 2019

---

13

1  A  Uh-huh.
2  Q  Who do you report to?
3  A  I report to ▮.
4  Q  Who is that?
5  A  Today it's ▮.
6  Q  And in 2009 who was it?
7  A  That was ▮.
8  Q  And do you have employees that work under
9  you that you oversee?
10 A  I do.
11 Q  How many employees?
12 A  Today I have -- I have ▮ government
13 and ▮ contractors, contract staff.
14 Q  So the government employees, they work
15 directly for the State Department?
16 A  Correct.
17 Q  And the contractors, are they housed
18 within the State Department?
19 A  Yes.
20 Q  But they're outside --
21 A  Uh-huh.
22 Q  -- contractors?

14

1  A  Yes, ma'am.
2  Q  And you mentioned in 2009, I suppose it
3  was the -- the former office, you called it the
4  S/ES-IRM?
5  A  Uh-huh. Information resource management
6  office. That's what that acronym stands for.
7  Q  And that -- the S/ES, is that specific --
8  A  The -- the Office of the Secretary's
9  Executive Secretariat, is the full name of the --
10 of the -- so you want me to give you the full
11 name? Office of the Secretary, the Executive
12 Secretariat's Information Resource Management.
13 Q  And --
14 A  Too -- too small to be anything big, so
15 it's just office within an office.
16 Q  And so, the technical support and -- and
17 your position is very -- is specific to the
18 Secretary's office?
19 A  Correct.
20 Q  And for purposes of this deposition, we
21 are going to concentrate on that time period of
22 working in IT and -- and your job as -- providing

15

1  ▮ ech support for the Secretary's office.
2  A  Okay.
3  Q  On a broad -- on a broad level, what are
4  your general responsibilities in your position?
5  A  In 2009?
6  Q  Yes.
7  A  They were basically to keep all the
8  communications, IT things that supported the
9  Office of the Secretary, the travel team, the
10 operations center, and those who traveled with the
11 Secretary, to include the Under Secretary -- the
12 Under Secretary of Political Affairs and the
13 Deputy Secretary.
14     And all those, the desktops, the
15 printers, those -- that infrastructure that
16 supports that back end, that was my team's
17 responsibility.
18 Q  And so, does that include e-mail
19 management --
20 A  Correct.
21 Q  -- or e-mail communication management?
22 A  Yes. We had Microsoft Exchange Servers

16

1  at that time, yes.
2  Q  And how long have you been working in IT?
3  A  Oh, my. My whole life, ma'am; before we
4  even knew it was IT or there was an internet.
5  Q  How long have you been at the State
6  Department?
7  A  I've been at the State Department, I
8  joined in ▮.
9  Q  And you're remained there since?
10 A  I have been. I've had two main positions
11 within the State Department. I came in as --
12 under the CIO in ▮, and then I went to the
13 Executive Secretary in 2007.
14 Q  And so you've been in the Executive
15 Secretary's office since 2007?
16 A  Yes, ma'am.
17 Q  Okay. So I'm going to bring us back a
18 little bit to -- to why you're here today.
19 A  Uh-huh.
20 Q  Do you know why you're here today, or why
21 you were brought in for this deposition?
22 A  So I assume that I'm here because it's

SUBJECT TO PROTECTIVE ORDER

Transcript of [REDACTED]   5 (17 to 20)
Conducted on October 11, 2019

---

**17**

1  e-mail and it's talking points, and the drama of
2  the -- of the e-mail servers of the past, yes.
3  And I'm in IT. And that's my role. That's my
4  assumption.
5     Q   Okay. And I -- I am going to represent
6  to you that we did bring you in because your name
7  came up in, you know, the FBI's and --
8  investigation of former Secretary Hillary
9  Clinton's use of a private server and personal
10 e-mail address during her tenure. And so I'm
11 going to talk a little bit about -- we can start
12 there.
13    A   Okay.
14    Q   Are you familiar with Secretary Clinton's
15 Clintonemail.com server system?
16    A   I am today, sure.
17    Q   And are you familiar with -- that
18 Secretary Clinton used a private e-mail address?
19    A   Correct.
20    Q   Do you know what that e-mail address was?
21    A   Uh-huh. I do.
22    Q   What was it?

**18**

1     A   CDR -- what is it? Maybe I don't
2  remember anymore. It's Clintonmail.com. So I
3  believe it was -- oh, shoot, I have forgotten.
4  How's that? I know I knew it.
5     Q   Is it safe to say it's HDR --
6     A   H -- that's it. Yeah. Hillary, yeah.
7     Q   -- 22 --
8     A   Yeah, 22@Clintonemail.com, yes, that's
9  right. Thank you for jogging my memory. But,
10 yes, I did know it back then.
11    Q   In 2009?
12    A   Through her tenure at the State
13 Department. Yes, ma'am.
14    Q   And so -- and you'll have to excuse me.
15 I may have you sort of walk me through a little
16 bit of the tech stuff sometimes.
17    A   I presumed. Yes.
18    Q   There's -- what I'm referring to is a
19 Clintonemail.com system.
20    A   Uh-huh.
21    Q   But part of that system was, as my -- as
22 I understand it, a server system.

**19**

1     A   Uh-huh.
2     Q   And then separately e-mail communication
3  or e-mail address.
4     A   Okay.
5     Q   Is that -- is that fair to say that --
6     A   Well, it's fair to say for all of us who
7  have e-mail, yes, ma'am. I mean, that's how
8  e-mail works. You have two components, which is
9  the delivery of your e-mail; and you have a place
10 to keep it, which is called the Inbox. Those are
11 servers. That's a -- just a basic no matter where
12 you go to get e-mail, even from Google, they have
13 those things, yes.
14    Q   And so, as I said, I'm going to sort of
15 address them a little bit separately, the server
16 system itself --
17    A   Okay.
18    Q   -- and e-mail communication --
19    A   Okay.
20    Q   -- of the Secretary.
21        And so, what do you know -- strike that.
22        When did you learn about Secretary

**20**

1  Clinton's private server, specifically the server?
2     A   Specifically the server? Actually --
3  okay. So I learned about the e-mail before the
4  server.
5        So -- something kind of --
6     Q   Do you want to --
7     A   Yeah, does it -- yeah, because it's more
8  chronological, easier to remember. Does that --
9  is that okay?
10    Q   Absolutely.
11    A   Sorry to change your question on you.
12       Is that fair?
13       So, of course, when a Secretary of State
14 comes in, we -- we give them a smorgasbord of
15 things you want; phones, stuff. And it was
16 decided that -- and it was actually normal. I
17 know it's kind of shocking today. But in 2009 it
18 was normal for the Secretary to keep the private
19 e-mail address. It was -- as it conveyed to us,
20 it was the e-mail that she used during the
21 campaign. She was just comfortable. It already
22 worked. She didn't want to change it. And we

~~SUBJECT TO PROTECTIVE ORDER~~
Transcript of [REDACTED]    6 (21 to 24)
Conducted on October 11, 2019

---

21

1  said okay, and we supported it.
2  Q   And this was --
3  A   Right around the transition. So it would
4  have been early spring of '09. Right? Yeah,
5  January -- July -- actually, it would have been,
6  like, February of '09.
7  Q   So during her transition when she came
8  in --
9  A   Uh-huh.
10 Q   -- her -- either Secretary Clinton
11 herself or maybe somebody in her office
12 specifically told you that she would be using
13 e-mail, her private e-mail address?
14 A   For --
15     MR. PRINCE: Objection. Form.
16     You may answer.
17 A   So I -- I -- yes. I mean, it -- it's
18 assume -- it's assumed that the conversation was
19 made with her. I am -- I'm not privy to that.
20 However, yeah, it -- it came down as from -- from
21 the transition team that, this is how we're going
22 to support her. Yes.

22

1  Q   And who -- who did you learn about it
2  from?
3  A   [REDACTED] John Bentel.
4  Q   John Bentel.
5      And this is specifically to her e-mail
6  address and personal e-mail use, address use?
7  A   Uh-huh. Yes.
8  Q   Was it your understanding that that
9  e-mail address would be used for State Department
10 business?
11 A   So I -- I -- I don't know. She is
12 keeping it. Typically -- let me go over it like
13 this: In that day, while BlackBerrys were
14 becoming popular, the way you feed a person whose
15 day is really measured in five-minute increments
16 is you -- you have a special -- or someone that
17 is whom everyone communicates with. And they are
18 the filter. Right?
19     So they hit the print or they're the ones
20 that show. BlackBerrys did change that world. It
21 was in the midst of that change of the world. So
22 at the time it was like, okay, she's going to use

23

1  her private, and the official communique would
2  either go through Huma or Mr. Jake Sullivan. And
3  that would have been how it was done for
4  Secretaries before. There's always someone that
5  proxied the Secretary. And that's why we have an
6  Executive Secretary, which is, you know, the --
7  the -- the business side of the State Department,
8  if you will. Right?
9      And then how that information is fed to
10 the Secretaries and up to the special. And that's
11 how it's done today, even for important people.
12 When your day is measured in five-minute
13 increments, you're not manage -- you're not
14 managing it on your own. You have an army behind
15 you.
16     And that -- and, again, that has changed
17 with electronics and -- and mobile. And certainly
18 we've changed our posture with it. But at that
19 time that was still the norm. We're the
20 government. We're slow to adjust.
21 Q   And just -- I think you mentioned this.
22 So who were the proxy -- who was the proxy or were

24

1  the proxies?
2  A   So I treated Huma Abedin's e-mail as her,
3  her BlackBerry as hers. We used to monitor all
4  the BlackBerrys. I still do in the iPhone world.
5  And we treated it as if that had a problem with
6  that device, it was the Secretary's device. So
7  through proxy hers and Mr. Jake Sullivan's. And
8  then depending on if she was on the road or in DC
9  which one we monitored. We absolutely monitored
10 theirs and treated them as if they were hers.
11 Because they would be the kind of filter gate to
12 information.
13 Q   And you mentioned a BlackBerry. Were
14 these State Department --
15 A   Yes.
16 Q   -- issued BlackBerrys?
17     COURT REPORTER: You have to let her
18 finish the question.
19     THE WITNESS: Sorry.
20 Q   So they were State-Department-issued
21 BlackBerrys.
22 A   Yes, ma'am.

SUBJECT TO PROTECTIVE ORDER

Transcript of ▮▮▮▮▮    7 (25 to 28)
Conducted on October 11, 2019

25

1  Q  To Miss -- to Huma Abedin and Jake
2  Sullivan?
3  A  Correct.
4  Q  And what e-mail address was associated
5  with those BlackBerrys?
6  A  I -- I've -- I don't even remember. I
7  know what our -- our e-mailing schema is, which is
8  last name, first initial, and middle initial. I
9  can only presume that that's what we used for
10 them.
11 Q  And it would be at a state.gov --
12 A  Correct.
13 Q  -- e-mail address?
14 A  Uh-huh.
15 Q  Were you aware of a Clintonemail.com
16 address for either Huma Abedin or Jake Sullivan?
17 A  No, I was not aware of them having one.
18 Q  At any time during --
19 A  Well, I certainly know now, with the
20 world and -- and all the FOIAs and the
21 conversations. But at the time, no, I was not
22 aware.

26

1  Q  So the way that your office communicated
2  with Secretary Clinton was through state.gov
3  e-mail addresses on State Department BlackBerrys
4  for Huma Abedin and Jake Sullivan.
5      Is that correct?
6  A  That's how we worked, yes, ma'am. At
7  least that's my view of how it worked. You
8  understand I'm -- I'm not in the business of -- of
9  the administrative pieces of all. You know,
10 I'm -- my job is to keep those things online and
11 running. And -- and that's -- but that's how I
12 viewed it. When -- when Huma or Jake had a
13 problem with that phone, it was the Secretary's
14 phone. And we brought it to everyone's attention
15 as if that was the priority, yes.
16 Q  What about the Secretary's personal
17 e-mail address, the @Clinton.com --
18 A  I had no access to it.
19 Q  You had no access?
20 A  Zero. Just like I have no access to
21 anybody's personal e-mail today.
22 Q  Okay. I'm going to back up a little bit,

27

1  because we just talked about the e-mail address,
2  and separately sort of walk through the
3  Clintonemail.com server.
4  A  Okay.
5  Q  When did you learn about the server?
6  A  Hurricane Sandy, or Super Storm Sandy, or
7  whatever the official name of that is now.
8  Q  And when was that?
9     Was that October 2012?
10 A  Ish. I believe, yes.
11 Q  And how did you come to learn about
12 the --
13 A  Well, because of the power outage of New
14 York.
15    MR. PRINCE: You need to let her finish.
16    THE WITNESS: Oh, I'm sorry.
17    THE COURT REPORTER: Thank you.
18    THE WITNESS: I apologize.
19 Q  How did you come to learn about the
20 Clintonemail.com server?
21 A  I found out about the server when New
22 York had the power outage from the hurricane and

28

1  they had lost communications. And I -- and I
2  basic -- we basically told that we can't -- we
3  can't help. We've got to wait for the power to
4  come on.
5     MR. PRINCE: Can we take a very brief
6  break, please?
7     MS. BURKE: Sure.
8     MR. PRINCE: Thank you.
9     VIDEO SPECIALIST: We are going off the
10 record at 10:14.
11    (A recess was taken.)
12    VIDEO SPECIALIST: We are back on the
13 record at 10:18.
14    MR. PRINCE: Before we proceed,
15 ▮▮▮▮▮ has a clarification he'd like to
16 make.
17 A  Yes. On the -- I believe your question
18 was the first time, and I erred. The first time
19 was an actual outage, or a problem with the server
20 that I learned. Which would have been in early
21 '09. I forgot about this.
22    There was a -- a mail problem between

SUBJECT TO PROTECTIVE ORDER

Transcript of ▮ 11 (41 to 44)
Conducted on October 11, 2019

---

41

1    A  Uh-huh. From our ▮ Notice the
2 title on her – yes.
3    Q  So ▮ I do see she is
4 ▮, ▮.
5    A  That was our help desk.
6    Q  So was she the first point of contact
7 when there's is a technical issue?
8    A  One – one of the few – yes. One of,
9 yes. How's that?
10   Q  And she sent an e-mail to ▮?
11   A  Uh-huh.
12   Q  With a copy to ▮.
13   A  Tech would be my team. FO stands for
14 front office, management.
15   Q  And who would be in the front office
16 management?
17   A  John Bentel.
18   Q  Who else would be included?
19   A  2010? 2010 would have been Yvette Jacks.
20   Q  Who is Yvette Jacks?
21   A  Yvette Jacks would have been John
22 Bentel's Deputy. And Milton Green, maybe?

42

1    Q  Who is Milton Green?
2    A  Milton Green would have been his foreign
3 service deputy at the time.
4    Q  And it --
5    A  Those – those three equal the front
6 office.
7    Q  The front office?
8      And as far as the -- the tech office, you
9 said that's ▮?
10   A  That would be ▮
11   Q  Who would be included?
12   A  Oh, at the time, it's going to a blend of
13 those contractors and government folks that I
14 mentioned before.
15      (A discussion was held off the record.)
16   Q  Okay. So it looks like ▮ at the help
17 desk contacted your office as well as the front
18 office. And she said that she met with Huma. I
19 assume that's Huma Abedin?
20   A  Uh-huh.
21   Q  For about 30 minutes to go over mail
22 issues.

43

1      And you said that you do -- do you
2 recognize that specific e-mail?
3    A  Yes, ma'am. This is the event that I
4 described before. Like I said, my timing was off,
5 way off.
6    Q  And was this the first time that you were
7 learning of the Clintonemail.com server?
8    A  This specific server, yes.
9      Does that make sense?
10   Q  Yeah. If you could just go above. Who
11 is ▮?
12   A  ▮ worked for me at the time. He was
13 my lead technician.
14   Q  And he says, '▮, could you
15 look into this immediately."
16      Who are ▮?
17   A  So ▮ as you see above, ▮
18 responded. ▮ are – was our exchange
19 experts at the time.
20   Q  And I see that e-mail that you're
21 pointing out right above, it does say, ▮
22 ▮."

44

1      So would this be a third-party
2 contractor?
3    A  Correct.
4    Q  And I see ▮ then forwarded this message
5 to ▮ Is that correct?
6    A  Uh-huh. Yes, ma'am. Sorry. Thank you.
7    Q  And it -- you may have said this before.
8 So why did ▮ contact ▮ on this
9 issue?
10   A  To troubleshoot specifically. I think
11 the conversation is, this is not getting there,
12 can I see this. They're – they're talking
13 technical things. They're – ▮ on the server
14 here in the Department of State. I'll presume
15 that ▮ is on the server at Clinton mail. And
16 they're troubleshooting. And ...
17   Q  And if I could bring you down to -- on
18 the very last page. It's a little bit difficult
19 to read, because I think it had at some point been
20 highlighted. But that Number 3. Can you read
21 that?
22   A  No. Sorry. ▮



SUBJECT TO PROTECTIVE ORDER

Transcript of ▇▇▇▇▇▇▇▇  16 (61 to 64)
Conducted on October 11, 2019

---

**61**

1 to isolate the problem, is what you're seeing.
2   Q   And I understand that. I appreciate
3 that. I do want to -- I guess what I'm trying to
4 get at is, my question is related to the
5 Clintonemail.com e-mail addresses were being
6 delivered or, as it says, ▇▇▇ on State
7 Department servers?
8   A   I believe that's what it is, yes.
9   Q   Okay.
10  A   Right? When you hit the ▇▇▇ you
11 don't deliver; you ▇▇ it.
12  Q   And in order to move that through, the
13 State Department made changes on their end?
14  A   Correct.
15  Q   Who is ▇▇▇▇▇▇▇
16  A   ▇▇▇▇▇▇?
17  Q   In the e-mail just above the one we were
18 just talking about on Page 11.
19  A   ▇▇▇ was not on my team, ma'am, so I
20 can only presume he was a technician in ▇▇ I
21 don't know that for sure. That's a presumption,
22 because I can eliminate the fact that he was not

**62**

1 on my team.
2   Q   Not on your team. Okay.
3       If you can go to Page 10. At the very
4 bottom ▇▇▇▇▇▇▇ says, ▇▇▇▇▇▇▇▇▇▇
5 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
6 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
7 ▇."
8       And then directly above it looks like
9 ▇▇▇▇▇▇ states, ▇▇▇▇▇▇▇▇▇▇▇▇
10 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
11      Is that because ▇▇▇▇▇ was looking
12 on the OpenNet, the State Department?
13  A   It looks like ▇▇▇▇▇, if you go back
14 to Page 11, madam, he was trying to confirm is it
15 ▇▇▇▇▇ or not Clinton -- with an ▇. See
16 how he's trying to find out what the name of it
17 was?
18  Q   Uh-huh.
19  A   And then it looks like ▇▇▇▇
20 clarified the full name of the domain by saying,
21 It's this name.
22      And then, boom, you see later on ▇▇

**63**

1 now dumping all the e-mails that he could see.
2       Does that make sense?
3   Q   It does. And so, Ms. Jacks at that time,
4 in clarifying, she was aware that the
5 Clintonemail.com is a separate source domain
6 outside of state.gov?
7   A   Yes.
8   Q   Okay. Just above that, there are a few
9 more added to the list. ▇▇▇▇▇▇, who is
10 that? If you know?
11  A   ▇▇▇▇▇, because he still works
12 there, is a contractor for ▇▇ He is an exchange
13 engineer.
14  Q   How about ▇▇▇▇▇▇▇▇?
15  A   I don't know.
16      But this is a technical thread, so I --
17 you can fairly be certain that the majority of
18 these e-mails are engineers, technicians.
19  Q   On Page 5, who is ▇▇▇▇▇▇▇?
20      Do you know?
21  A   ▇▇▇▇▇▇▇ was a part of my team.
22      He was a contractor for ▇▇▇

**64**

1   Q   Okay. I'm all done with that. Just
2 give -- bear with me one second.
3       So you testified that you first learned
4 of the Clintonemail.com server in -- at -- the
5 specific technical issues that we just described
6 in --
7   A   Yes, ma'am.
8   Q   And you had said it was 2009.
9   A   I was in error, said 2009, yes.
10  Q   So am I correct in saying it was around
11 December 2010?
12  A   Yes, ma'am.
13  Q   Okay. So were you involved in setting up
14 the Clintonemail.com server?
15  A   No, ma'am.
16  Q   Do you know who set it up?
17  A   I can only presume. Bryan Pagliano.
18  Q   Why do you say that?
19  A   Because he's who my point of contact was.
20  Q   And do you know where the server was
21 located?
22  A   Not until Hurricane Sandy, ma'am.

SUBJECT TO PROTECTIVE ORDER

Transcript of ▮  23 (89 to 92)

Conducted on October 11, 2019

---

89

1         VIDEO SPECIALIST: We are back on the
2 record at 11:38.
3     BY MS. BURKE:
4     Q   Okay. ▮ do you know who
5 ▮ is?
6     A   ▮ ?
7     Q   ▮ yes.
8     A   Yes. He was ▮ to John Bentel. He
9 was the ▮. So -- and it
10 could have been him instead of ▮
11 ▮ So because he ▮
12 ▮, so I guess is what I'm trying to say.
13     Q   And that was in the front office of
14 S/ES-IRM?
15     A   Correct.
16     Q   Have you ever met him?
17     A   Yes.
18     Q   For what purposes?
19     A   Work.
20     Q   Have you ever talked with him about
21 either the Clintonemail.com server or the
22 Clintonemail.com e-mail addresses that the

90

1 Secretary used?
2     A   So he was a part of transition, I
3 believe. I'm trying to think when he left
4 S/ES-IRM and went back overseas.
5     So likely, yes. Because he could have
6 been -- he may have transitioned in '09, maybe. I
7 can't remember when he came and ▮ left now,
8 tell you the truth.
9     Q   Do you remember any specific
10 conversations --
11     A   None.
12     Q   -- regarding either the e-mail address or
13 the server?
14     A   None.
15     Q   Turning back, sorry, to Exhibit 3?
16     A   Uh-huh.
17     Q   Again, this is on that page, it's Page 4,
18 but I think at the top it says Page 5 of 9.
19     A   Okay.
20     Q   Would -- would ▮ possibly be
21 one of the -- of the individuals?
22     A   I can't rule it out, ma'am. I don't

91

1 know. But I couldn't rule it out.
2     Q   Did you work with ▮ on any of
3 the troubleshooting or support issues that you've
4 identified related to the Clinton e-mail?
5     A   Huh. In '10? Again, I'm -- I thought it
6 was ▮. It could have been him. I'm a
7 little blurred on who was what, when, where, and
8 how. Sorry.
9     Q   That's okay.
10     A   But, sure, being in the front office, if
11 he was in the front office during that time, he
12 would have been on an e-mail, he would have been a
13 part of that. ▮ and ▮ would have been the
14 ▮.
15     Q   Let me just jump back. You identified
16 Yvette Jacks. Correct?
17     A   Correct.
18     Q   She was the deputy to Mr. Bentel?
19     A   Correct.
20     Q   And is she still in that position?
21     A   No. She's gone.
22     Q   When --

92

1     A   She's left the department.
2     Q   When did she leave?
3     A   Again, '15, I believe. I'm not a hundred
4 percent sure.
5     Q   Who -- who is in her position now?
6     A   We actually don't have a deputy any
7 longer. Right now is we have four divisions
8 within the group. Like I said, we -- we
9 reorganized into exec tech, so the deputies are
10 now division chiefs, and a little bit bigger
11 group.
12     Q   So what -- what was her role as -- as
13 deputy?
14     A   So her role would have been kind of the
15 stuff in DC. And then whereas the foreign
16 services, more of the travel role. I mean, as the
17 deputy, they -- they act on and divide and conquer
18 all the things that the office needs to take care
19 of.
20     The way John had it set up was she was --
21 what's the word? Domestic, I guess, you know, all
22 the things that we have to deal with, the ops

SUBJECT TO PROTECTIVE ORDER

Transcript of ▮▮▮▮▮   24 (93 to 96)
Conducted on October 11, 2019

---

### 93

1  center and the line and within DC area. And the
2  Foreign Service Officer ▮▮▮ would -- would have
3  been all the travel aspects and the travel team
4  and all that.
5      Q   So would Yvette Jacks be the deputy that
6  handled Secretary Clinton's e-mail address or
7  private server?
8      A   Likely.
9      Q   Would she have been aware of Secretary
10 Clinton's server and e-mail address?
11     A   She's on the e-mails of the
12 troubleshooting in your other exhibit, ma'am. So,
13 yes, that's -- that's ...
14     Q   Do you know, was she aware during the
15 time of transition?
16     A   Transition she was in I&R. Yes.
17 Intelligence & Research Bureau.
18     Q   So would she have been aware of Secretary
19 Clinton's server and e-mail address during
20 transition period? Or no, because she is in a
21 different department?
22     A   She cared about different things back

### 94

1  then.
2      Q   Okay.
3          MR. PRINCE: Just remember you need to
4  give a verbal response.
5      A   No. She would have cared about other
6  things back then. Sorry to shake my head.
7      Q   Okay. Who is ▮▮▮
8      A   ▮▮▮▮▮▮▮▮▮▮ was the
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12     Q   Would he have been -- is it possible that
13 he would be one of the individuals that
14 Mr. Pagliano identifies here?
15     A   He could have been.
16     Q   Do you know which --
17     A   No.
18     Q   -- incidents he would have been involved
19 with?
20     A   No, I don't. But I can't rule him out.
21     Q   Would it be ▮▮▮▮▮ or
22 ▮▮▮▮▮ that would call Mr. Pagliano to the

### 95

1  7th floor?
2      A   No, ma'am. ▮▮▮▮▮ worked on the
3  6th floor.
4      Q   Would Mr. Pagliano have reported such a
5  meeting to ▮▮▮
6      A   I would have no idea.
7      Q   Because you identified Mr. Pagliano was
8  in the office of the CIO? Correct?
9      A   Correct.
10     Q   So ▮▮▮▮▮ was his boss?
11     A   No, ma'am. As the ▮▮▮▮ ,
12 ▮▮▮▮▮ would be like just different
13 concern. So Mr. Pagliano was in the office with
14 the CIO along with all the other special
15 assistants that a CIO would have, to include an
16 office manager. Whereas the ▮▮▮▮ had a
17 separate office, and he ▮▮▮▮▮
18 ▮.
19     Q   But they worked in the same office.
20     A   Yes.
21     Q   On the 6th floor, you said?
22     A   I believe that's where they were at the

### 96

1  time, yes.
2      Q   How often was Mr. Pagliano on the 7th
3  floor?
4      A   I have no idea, madam.
5      Q   Do you know how often he met with
6  Ms. Cheryl Mills?
7      A   No. I mean, I wouldn't even know why he
8  would meet with her. But I guess he did. No.
9  The answer is no.
10     Q   If I could just bring your attention to
11 sort of the middle of that paragraph.
12     A   On Page 5?
13     Q   Yes. It's one, two, three, four ...
14     A   Okay.
15     Q   Eight lines down.
16     A   He approached her. Yeah. Okay.
17     Q   In the middle it starts with, blank
18 "relayed to Pagliano that he wanted to convey this
19 to Hillary Clinton's inner circle, but could not
20 reach them and asked if Pagliano would relay this
21 information."
22         Who would Hillary Clinton's inner circle

SUBJECT TO PROTECTIVE ORDER

Transcript of ▉▉▉▉▉▉▉▉▉▉  26 (101 to 104)
Conducted on October 11, 2019

---

101

1  A  Yes.
2  Q  Did you know that she used it for State
3  Department related work?
4  A  Factually, no. Presumptively, sure. I
5  mean, I troubleshot it. It wasn't working with
6  the State Department. I can only presume she's
7  using it for State Department work, yes.
8  Q  So there were times you troubleshot her
9  BlackBerry.
10 A  No, ma'am. Going back to Exhibit 1.
11 Having troubleshot the exchange server, the
12 BlackBerry connects to the exchange server.
13 Therefore, yes, I assumed.
14 Q  Who was it that had direct interaction
15 with Secretary Clinton's staff regarding
16 communications issues?
17 A  Bryan Pagliano.
18 Q  How about Mr. Bentel?
19 A  Mr. Bentel would – would have access to
20 it. I don't know how he gained, so I – you would
21 have to speak to Mr. Bentel. I don't know.
22 Q  Did you ever have discussions with anyone

102

1  about changing Secretary Clinton's e-mail to a
2  state.gov –
3  A  I did not have any conversations, no.
4  Q  – e-mail account?
5     Do you know anyone that may have, or that
6  did?
7  A  I can only presume that those
8  conversations were had, but I don't – I'm not
9  aware of any of those specifications.
10 Q  Who would have been involved in those
11 conversations?
12    MR. PRINCE: Objection. Form.
13 A  Mr. Bentel.
14 Q  How about Yvette Jacks?
15 A  No, because she wasn't a part of the
16 transition team.
17 Q  How about ▉▉▉▉▉▉▉▉▉▉▉?
18 A  He would have had access.
19 Q  And had those conversations with –
20 A  He could have. I'm not aware of that he
21 did, nor did he ever tell me he did.
22 Q  Do you know what a hot wash is?

103

1  A  Of course.
2  Q  What is it?
3  A  It's after an event is done, like a trip,
4  you have hot washes. And you explain what went
5  right, what went wrong, what to do again. That's
6  how we do our lessons learned.
7     MS. BURKE: I'm going to have a document
8  marked as Exhibit 4.
9  A  So you're done with this?
10 Q  Yes, please.
11    (▉▉▉▉ Deposition Exhibit 4 marked for
12 identification and is attached to the transcript.)
13    MS. BURKE: And, for the record, this is
14 a document at the bottom identified as Document
15 Number ▉▉▉▉▉. And this was produced in
16 another FOIA case to Judicial Watch.
17 A  So I guessed right.
18 Q  On what?
19 A  Purcell Lee.
20 Q  Who is Lee Purcell, or Purcell Lee?
21 A  Purcell Lee used to work for the
22 Executive Secretary, and that was his portfolio,

104

1  was handling the residence. He would do the
2  secure video and the secure voice connections.
3  Q  For S/ES-IRM?
4  A  For the Secretary.
5  Q  For the Secretary?
6  A  For the Deputy Secretary and the
7  political Secretary.
8  Q  And you see that it says, '▉▉▉▉▉▉
9  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ And
10 the subject matter is "Secretary residential
11 installation hot wash."
12 A  Uh-huh.
13 Q  Do you know what this is referring to?
14 A  So every Secretary has the ability to
15 have communications set up at their house so that
16 they can stay in contact with the president.
17 That's what this was. It was probably a – it was
18 probably a walk through of the Washington, DC,
19 residence, and with the security team, to make
20 sure that the – the home was secure and could
21 have the installation of A, B, C, D, E, F, which
22 is the STE, the Red Switch, the Ops Drop,

SUBJECT TO PROTECTIVE ORDER

Transcript of [REDACTED]          28 (109 to 112)
Conducted on October 11, 2019

109

1  lost use of her Clintonemail.com e-mail
2  capabilities. Correct?
3     A   Uh-huh.
4     Q   Was there any discussion at that time of
5  putting her on a state.gov?
6     A   Oh, I think probably that would have been
7  an option handed, yes.
8     Q   By who?
9     A   I have no idea. But that would certainly
10 be in the problem-solving mindset of something we
11 would have offered, yes.
12    Q   Do you know if there was a state.gov
13 e-mail address set up for Secretary Clinton at any
14 time?
15    A   We would have proposed one.
16    Q   When?
17    A   At transition.
18    Q   And do you know if one was set up?
19    A   Was it set up? No, it was never set up.
20 My team would have set it up. Was it proposed?
21 Absolutely. I'm sure. While I did not propose
22 it, I'm -- I can guess that one was proposed.

110

1       MS. BURKE: I'm going to mark this
2  document as Exhibit 5.
3       (Kling Deposition Exhibit 5 marked for
4  identification and is attached to the transcript.)
5     Q   Do you know why --
6       MR. PRINCE: Excuse me. Can we get
7  copies?
8       MS. BURKE: Oh, I'm so sorry.
9     Q   And -- and we will -- so what's been put
10 before you is a document marked as Exhibit 5. And
11 for the record, it's Document Number [REDACTED].
12 And it's an e-mail chain between Monica Hanley and
13 John Bentel.
14    A   Uh-huh.
15    Q   And Huma Abedin.
16        Were you aware of this -- it starts, '[REDACTED]
17        "-- from [REDACTED]
18        [REDACTED]."
19        Were you aware that e-mail account was
20 set up?
21    A   No, ma'am. But that's okay.
22    Q   Who would have set it up?

111

1     A   A handful of people.
2     Q   In your office?
3     A   Yes, ma'am. Our office would have set it
4  up.
5     Q   Why would it have been set up?
6     A   To be ready -- I don't know. Great
7  question. I don't know. In '11, I have no idea
8  why it would be set up in '11. I know why it
9  would be set up in '09, because it was offered to
10 her, probably.
11    Q   And do you know why Secretary Clinton
12 refused a state.gov e-mail address at
13 transition -- both at transition and at the time
14 period when her e-mail communication was down?
15    A   Okay. So that's two different questions.
16    Q   We can break it down.
17    A   Yeah, please.
18    Q   Do you -- do you know why Secretary
19 Clinton refused a state.gov e-mail address at
20 transition?
21    A   At transition, I was told by John Bentel
22 because she was comfortable and already had it and

112

1  everyone else had that e-mail already. She didn't
2  want to transition over. That's what John Bentel
3  told me.
4     Q   Who was "everyone else"?
5     A   Vague -- those she -- those to whom she
6  communicated with. She -- no specificity towards
7  that, just that. Which made sense to me
8  personally. Right? Do you want to change your
9  e-mail address all the time? Right?
10    Q   I'm not Secretary of State.
11    A   Right.
12    Q   Who did Mr. Bentel tell about the
13 Clintonemail.com e-mail address?
14    A   Please -- just rephrase. I didn't quite
15 understand.
16    Q   Sure. So you said that Mr. Bentel
17 told -- told you that this was the e-mail address
18 she was using?
19    A   She would -- she is going to retain her
20 e-mail from the campaign. She's not going to get
21 a state.gov e-mail.
22    Q   Did he communicate that with --

~~SUBJECT TO PROTECTIVE ORDER~~

Transcript of [REDACTED]   29 (113 to 116)
Conducted on October 11, 2019

113

| | | |
|---|---|---|
| 1 | A | The team. |
| 2 | Q | His team? |
| 3 | A | Yes. |
| 4 | Q | So everyone on his team was aware of — |
| 5 | A | Yes. |
| 6 | Q | — the Clintonemail.com address? |
| 7 | A | Yes. That's a very important piece of information that we would want to know, yes. |
| 9 | Q | Who else would need to know that information? |
| 11 | A | Anyone who wanted to talk to her. |
| 12 | Q | Do you — you identified Mr. Finney. Would he need to know that information? |
| 14 | A | Uh-huh. |
| 15 | Q | Did he know that information? |
| 16 | A | I — I can't speak for Clarence. I can only assume. |
| 18 | Q | And why would he need to know that information? |
| 20 | A | Because he's the records manager. |
| 21 | Q | So what does that mean? |
| 22 | A | That one day — |

114

1    MR. PRINCE: Objection to the form.
2    A    That one day he would need to collect the
3 records.
4    Q    You can put that aside.
5         Oh, actually, in breaking down the
6 compound question from earlier.
7    A    Oh.
8    Q    Do you know why Secretary Clinton refused
9 a state.gov e-mail address during that Hurricane
10 Sandy, when she lost e-mail communication?
11   A    No, I have —
12        MR. PRINCE: Objection. Form.
13   A    No, I have no idea.
14        THE WITNESS: My apologies.
15   Q    Do you know if at that time it was
16 offered to her again?
17   A    This is the first time I saw that it was
18 offered to her, that I can recall.
19   Q    Okay. You can put that aside.
20        MS. BURKE: I am going to have what's
21 marked as Exhibit 6.
22        [REDACTED] Deposition Exhibit 6 marked for

115

1 identification and is attached to the transcript.)
2    Q    And, for the record, what's been placed
3 in front of you and marked as Exhibit 6 is
4 Document Number [REDACTED]. And it is an e-mail
5 chain that seems to — from [REDACTED].
6         It looks as though [REDACTED]
7 from — to — I apologize, to the front office
8 management.
9         If I could just direct your attention —
10   A    Yes?
11   Q    I apologize.
12        So the issue was that it looks as though
13 [REDACTED] came to [REDACTED].
14        What's [REDACTED]?
15   A    That's the [REDACTED] ma'am.
16   Q    I see. With a message from Huma that
17 anyone sending from @Clintonemail.com is coming
18 into state.gov address sporadically.
19        And then if you turn to the first page,
20 the very bottom, it looks as though [REDACTED]
21 [REDACTED] —
22   A    Uh-huh.

116

1    Q    — stated that [REDACTED] has
2 added Clintonemail.com to its [REDACTED].
3         And then at the very top you state, your
4 last sentence, [REDACTED]
5 [REDACTED]
6         Do you recall this e-mail communication?
7         MR. PRINCE: Objection. Form.
8    A    And — and, no. But ...
9    Q    I apologize. It actually — you're
10 right. It was from [REDACTED].
11   A    Okay. Oh, [REDACTED] said I thought this
12 was —
13   Q    Correct.
14   A    I ...
15   Q    What is the [REDACTED]?
16   A    And I don't even know reference to that
17 anymore. I'm trying to figure that out, ma'am.
18        This preceded. I'm trying to figure
19 timelines. And this preceded the troubleshooting.
20 So I have a feeling this was probably related to
21 the December, and this was an attempt to correct
22 that failed.

SUBJECT TO PROTECTIVE ORDER

Transcript of [REDACTED]  41 (161 to 164)
Conducted on October 11, 2019

161

ACKNOWLEDGMENT OF DEPONENT

1. I, [REDACTED] do
2. hereby acknowledge that I have read and examined
3. the foregoing testimony, and the same is a true,
4. correct and complete transcription of the
5. testimony given by me, and any corrections appear
6. on the attached Errata sheet signed by me.

_____    _____
(DATE)                     (SIGNATURE)

162

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Debra Ann Whitehead, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true and
5  correct record of the testimony given; that said
6  testimony was taken by me stenographically and
7  thereafter reduced to typewriting under my
8  direction; that reading and signing was requested;
9  and that I am neither counsel for, related to, nor
10 employed by any of the parties to this case and have
11 no interest, financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand and
13 affixed my notarial seal this 13th day of October,
14 2019.
15
16 My commission expires:
17 September 14, 2023
18
19 _____
20 NOTARY PUBLIC IN AND FOR THE
21 DISTRICT OF COLUMBIA
22