UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No. 14-1242 |
| ) | |
| U.S. DEPARTMENT OF STATE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ORDER

On December 6, 2018, the Court ordered discovery into three main areas: (a) whether Secretary Clinton's use of a private email while Secretary of State was an intentional attempt to evade FOIA; (b) whether the State Department's attempts to settle this case in late 2014 and early 2015 amounted to bad faith; and (c) whether State has adequately searched for records responsive to Judicial Watch's request. Although discovery in FOIA cases is rare, the Court again reminds the government that it was State's mishandling of this case—which was either the result of bureaucratic incompetence or motivated by bad faith—that opened discovery in the first place.

Discovery up until this point has brought to light a noteworthy amount of relevant information, but Judicial Watch requests an additional round of discovery, and understandably so. With each passing round of discovery, the Court is left with more questions than answers. What's more, during the December 19, 2019, status conference, Judicial Watch disclosed that the FBI recently produced approximately thirty previously undisclosed Clinton emails. State failed to fully explain the new emails' origins when the Court directly questioned where they came from.[1]

---

[1] On February 12, 2020, Judicial Watch informed the Court that a recently obtained Clinton email—produced in an unrelated FOIA case involving State—strongly suggests that Secretary Clinton and her Deputy Chief of Staff, Huma Abedin, conducted State Department business via text messaging as well. Pl.'s Notice Suppl. Information 1, ECF No.

1

Furthermore, State has not represented to the Court that the private emails of State's former employees who corresponded with Secretary Clinton have been searched for additional Clinton emails. State has thus failed to persuade the Court that all of Secretary Clinton's recoverable emails have been located. This is unacceptable.

State asks the Court to close discovery and to move this case towards dispositive motions and an eventual resolution. But there is still more to learn. Even though many important questions remain unanswered, the Justice Department inexplicably still takes the position that the Court should close discovery and rule on dispositive motions. The Court is especially troubled by this. To argue that the Court now has enough information to determine whether State conducted an adequate search is preposterous, especially when considering State's deficient representations regarding the existence of additional Clinton emails. Instead, the Court will authorize a new round of discovery as follows.

### *Brett Gittleson and Yvette Jacks*

Mr. Gittleson was the Director of the Office of the Secretary, the Executive Secretariat's Information Resource Management (hereinafter "S/ES-IRM") in 2013 and 2014. Pl.'s Status Report 2, ECF No. 152. That office was charged with providing technical support—including email management—to the Office of the Secretary during Secretary Clinton's years at the helm. S/ES-IRM Official Dep. 11:17–12:6; 14:1–16:16, ECF No. 152-1. In late 2012 or early 2013, Mr. Gittleson became the director of S/ES-IRM, and in April or May 2013, he discussed Secretary Clinton's email use with Gene Smilansky, an attorney in the Office of the Legal Advisor. Pl.'s Status Report 2. Mr. Smilansky had experience working on FOIA lawsuits, including one related to Secretary Clinton's emails. *Id.* at 3.

---

160. The government has not provided any information about whether such text messages were searched pursuant to FOIA.

2

Ms. Jacks was a Deputy Director of S/ES-IRM from 2010 to 2015 and assisted with the troubleshooting of Secretary Clinton's private server while in that role. *Id.* at 3–4; S/ES-IRM Official Dep. 93:5–13. During Tasha Thian's deposition, Ms. Thian identified Ms. Jacks as an employee who maintained the list of gatekeepers for Secretary Clinton's communications. Thian Dep. 125:17–126:2, ECF No. 152-3. Ms. Thian also testified to something troubling—that several S/ES-IRM employees may have intentionally withheld information about Secretary Clinton's email arrangements. *Id.* at 151:18–152:15.

Judicial Watch seeks to depose Mr. Gittleson and Ms. Jacks because they may have relevant knowledge of Secretary Clinton's email use. *See* Pl.'s Status Report 2–4. State argues that any further discovery would be cumulative or irrelevant. *See* Def.'s Status Report 5–7, ECF No. 154. The Court agrees with Judicial Watch and believes these two former employees may offer new and relevant testimony. Mr. Gittleson and Ms. Jacks may be questioned—within the parameters set forth in the Court's December 6, 2018, memorandum opinion and order authorizing discovery—about their knowledge of Secretary Clinton's email use and any other non-privileged conversations pertaining to her email use. Accordingly, the Court **GRANTS** Judicial Watch's requests to depose Mr. Gittleson and Ms. Jacks.

### *Paul Combetta*

Mr. Combetta is an IT specialist who was involved with the transfer and deletion of Secretary Clinton's emails. *See* Pl.'s Status Report 4–5. Judicial Watch seeks to depose Mr. Combetta to learn more about the archiving, existence, and deletion of any of Secretary Clinton's emails. *Id.* at 5. Additionally, Judicial Watch asks the Court to require Mr. Combetta to bring to his deposition all records in his possession relating to Secretary Clinton's emails from her time at State. *Id.* On December 30, 2019, Judicial Watch informed the Court that Mr. Combetta would

assert his Fifth Amendment privilege against self-incrimination if Judicial Watch served a subpoena on him.[2] Status Report Regarding Combetta Dep. 1, ECF No. 155. The Court sees no reason to authorize what would be an exercise in futility. Accordingly, the Court **DENIES** Judicial Watch's request to depose Mr. Combetta.

### *State Department Interrogatories*

Judicial Watch seeks to serve two additional interrogatories on State. First, Judicial Watch asks State to "[i]dentify the number of FOIA lawsuits pending in 2014 that sought records relevant to Secretary Clinton's emails from her tenure at the State Department." Pl.'s Status Report 5. Of the total number of those lawsuits, Judicial Watch asks State to "identify the number of lawsuits the State Department attempted to settle from January 2014 through February 2015." *Id.* The Court agrees with State and holds that the first request is ambiguous and therefore inherently burdensome. The information Judicial Watch seeks is likely also publicly available. The Court **DENIES** the first request.

The second request is similarly ambiguous, unduly burdensome, and disproportionate to the needs of the case. Additionally, the request seeks information related to internal settlement discussions, which likely would be protected by the work-product doctrine. The likelihood of receiving relevant, non-privileged information does not warrant the search, so the Court **DENIES** the second request.

### *Subpoena for Documents*

Judicial Watch seeks to subpoena Google for relevant documents and records associated with Secretary Clinton's emails during her tenure at State. *Id.* at 5–6. The subpoena seeks to discover new emails, so it certainly relates to whether State conducted an adequate search. But

---

[2] The Justice Department gave Mr. Combetta only limited-use immunity during the FBI's investigation into Secretary Clinton's private server. Status Report Regarding Combetta Dep. 1, ECF No. 155.

State points out that Judicial Watch fails to explain how this search would be any more fruitful than the FBI's extensive investigation into Secretary Clinton's missing emails. *See* Def.'s Status Report 8–9. According to State, the request is disproportionate to the needs of the case because it is highly unlikely that Judicial Watch would receive any relevant information or emails that the FBI or DOJ Inspector General failed to uncover. *See id.*

The Court is not confident that State currently possesses every Clinton email recovered by the FBI; even years after the FBI investigation, the slow trickle of new emails has yet to be explained. For this reason, the Court believes the subpoena would be worthwhile and may even uncover additional previously undisclosed emails. Accordingly, the Court **GRANTS** this request.

### *Cheryl Mills*

Judicial Watch seeks to depose Ms. Mills on all areas of discovery. Ms. Mills—appearing as a non-party in this case—opposes this request because Judicial Watch already deposed her in Judicial Watch's FOIA case before Judge Sullivan, *Judicial Watch, Inc. v. U.S. Dep't of State*, Case No. 13-cv-1363 (D.D.C.). *See* Mills Obj. Dep. 1–2, ECF No. 142. According to Ms. Mills, any further discovery would be duplicative because she already testified for seven hours during her previous deposition to all relevant issues in this case. *See id.*

Judicial Watch argues that it should be able to depose Ms. Mills in this case because it knows more information now than it did when it deposed her in 2016. *See* Pl.'s Combined Reply 10–12, ECF No. 144. The Court sympathizes with this argument—now that Judicial Watch has a better understanding of what happened, it should have an opportunity to craft new questions derived from newly discovered facts. When Ms. Mills was deposed, Judicial Watch was not aware of the 30,000 deleted Clinton emails or that a Congressional subpoena had already been served on Secretary Clinton for her Benghazi records. *Id.* at 12. Furthermore, State's mishandling of this

5

case opened up discovery in the first place, and Judicial Watch should not be prohibited from asking Ms. Mills about what it learned from discovery just because she was deposed over three years ago in Judicial Watch's case before Judge Sullivan.

To the extent that Judicial Watch tailors relevant, non-duplicative questions—and those questions fall within the parameters set forth in the Court's December 6, 2018, memorandum opinion and order authorizing discovery—the Court **GRANTS** Judicial Watch's request to depose her on all areas of discovery.

### *Secretary Hillary Clinton*

Judicial Watch believes it is now necessary to depose Secretary Clinton because significant questions pertaining to her state of mind remain that only she can answer. *See* Pl.'s Combined Reply 1–2. Secretary Clinton—appearing as an intervenor in this case—disagrees. She argues that the only relevant information she would have knowledge of is whether she used a private server to evade FOIA. *See* Clinton Opp. Dep. 5–6, ECF No. 143. State's settlement attempts and its search for records in response to Judicial Watch's FOIA request occurred well after Secretary Clinton's departure. *See id.* The Court mostly agrees with Secretary Clinton here—any further discovery should focus on whether she used a private server to evade FOIA and, as a corollary to that, what she understandood about State's records management obligations.[3]

But Secretary Clinton maintains that she has already testified extensively and in multiple settings about her reasons for using a private server, so any additional discovery would be duplicative. *See id.* at 6–12. She reminds the Court that the findings of the Benghazi Select Committee, the State Department Inspector General, and the FBI all relate to her use of a private server and that they are all publicly available. *Id.* at 7. Additionally, Secretary Clinton answered

---

[3] The sole exception to these limitations pertains to records of the Benghazi attack, which will be explored further in the next section of this order.

several questions related to her reasons for using a private server through interrogatories in Judicial Watch's case before Judge Sullivan. *See id.* at 7–8. Secretary Clinton specifically highlights the interrogatories that focus on how, when, and why she set up and used a private server. *See id.* Furthermore, because Secretary Clinton was a high-ranking government official, she argues that the apex doctrine requires Judicial Watch to demonstrate that "extraordinary circumstances" justify this discovery request. *Id.* at 6–7 (quoting *Judicial Watch v. U.S. Dep't of State*, No. 13-cv-1363, 2016 WL 10770466, at *6 (D.D.C. Aug. 19, 2016)). According to Secretary Clinton, Judicial Watch cannot meet that burden because her existing, publicly available testimony already answers Judicial Watch's questions. *See id.* at 7.

For its part, Judicial Watch argues that Secretary Clinton's existing testimony has only scratched the surface of the inquiry into her motives for setting up and using a private server. Pl.'s Combined Reply 2–3. Secretary Clinton has repeatedly stated that convenience was the main reason for using a private server, *see, e.g.*, Clinton Interrog. 5, ECF No. 143-1, but Judicial Watch justifiably seeks to explore that explanation further.

Judicial Watch also requests permission to question Secretary Clinton in greater detail about her understanding of State's records management obligations—including questions about her various trainings and briefings regarding these obligations. *See* Pl.'s Combined Reply 3–9. Judicial Watch correctly points out that many questions regarding her understanding of these obligations still remain unanswered. *See id.* at 6–7. For example, how did she arrive at her belief that her private server emails would be preserved by normal State Department processes for email retention? Who told her that—if anyone—and when? Did she realize State was giving "no records" responses to FOIA requests for her emails? If so, did she suspect that she had any obligation to disclose the existence of her private server to those at State handling the FOIA

7

requests? When did she first learn that State's records management employees were unaware of the existence of her private server? And why did she think that using a private server to conduct State Department business was permissible under the law in the first place? Again, who told her that—if anyone—and when? These areas of inquiry have not been explored in nearly enough detail to convince the Court that Secretary Clinton does not have any new testimony to offer.

The Court also needs to know whether Secretary Clinton was aware of the active steps taken to prevent others at State—especially those who worked in records management—from learning about her private server. In a December 24, 2010, email exchange, one State Department official accidently sent an email which listed Secretary Clinton's private email address to other employees who did not already have that information, prompting a second State Department official to reply, "Be careful, you just gave the secretary's personal email address to a bunch of folks . . . [.]" Pl.'s Combined Reply Ex. D, ECF No. 144-4. The first official responded, "Should I say don't forward? Did not notice[.]" *Id.* The second official replied, "Yeah-I just know that she guards it pretty closely[.]" *Id.* How could Secretary Clinton possibly believe that everyone at State knew about her private server if her subordinates took pains to ensure that her email address would not be widely disseminated? Was she aware of this attempt—or any other attempts—to keep other State Department employees in the dark? Secretary Clinton's answers to these questions directly relate to her understanding of her records management obligations.

As extensive as the existing record is, it does not sufficiently explain Secretary Clinton's state of mind when she decided it would be an acceptable practice to set up and use a private server to conduct State Department business. Even Huma Abedin, one of Secretary Clinton's closest confidants, testified that Judicial Watch "would have to ask [Secretary Clinton]" herself to ascertain whether the Secretary knew if her use of a private server satisfied her FOIA obligations.

8

Abedin Dep. 115:17–116:3, *Judicial Watch, Inc. v. U.S. Dep't of State*, Case No. 13-cv-1363, ECF No. 129. The Court authorizes Judicial Watch to do so. And, contrary to Secretary Clinton's assertion, the apex doctrine does not shield her from testifying.[4]

Because Judicial Watch has convinced the Court of the need for further discovery from Secretary Clinton, the only remaining issue is whether the Court should authorize additional interrogatories or a deposition of Secretary Clinton. As the parties point out, Secretary Clinton already answered interrogatories in Judicial Watch's case before Judge Sullivan. But after carefully considering the discovery materials uncovered in this case and Judge Sullivan's case, including Secretary Clinton's responses, the Court believes those responses were either incomplete, unhelpful, or cursory at best. Simply put, her responses left many more questions than answers.

The Court expects that additional interrogatories will only muddle any understanding of Secretary Clinton's state of mind and fail to capture the full picture, thus delaying the final disposition of this case even further. The Court has considered the numerous times in which Secretary Clinton said she could not recall or remember certain details in her prior interrogatory answers. In a deposition, it is more likely that plaintiff's counsel could use documents and other testimony to attempt to refresh her recollection. And so, to avoid the unsatisfying and inefficient outcome of multiple rounds of fruitless interrogatories and move this almost six-year-old case closer to its conclusion, Judicial Watch will be permitted to clarify and further explore Secretary

---

[4] It is true that high-raking government officials "should not, absent extraordinary circumstances, be called to testify regarding their reasons for taking official actions." *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941)). But the only person who can speak to Secretary Clinton's reasons for setting up and using a private server and her understanding of State's records management obligations is Secretary Clinton herself. Secretary Clinton unquestionably has unique first-hand knowledge of these matters, so Judicial Watch has demonstrated "extraordinary circumstances." *See FDIC v. Galan-Alvarez*, No. 15-mc-752 (CRC), 2015 U.S. Dist. LEXIS 130545, at *12 (D.D.C. Sept. 4, 2015) (explaining that a party may depose a high-raking government official if the official has "unique first-hand knowledge related to the litigated claims") (quoting *Lederman v. N.Y.C. Dep't of Parks and Recreation*, 731 F.3d 199, 203 (2d Cir. 2013)).

Clinton's answers in person and immediately after she gives them. The Court agrees with Judicial Watch—it is time to hear directly from Secretary Clinton.

Accordingly, the Court **GRANTS** Judicial Watch's request to depose Secretary Clinton on matters concerning her reasons for using a private server and her understanding of State's records management obligations, but **DENIES** its request to depose her on all other matters—with one exception outlined in the next section of this order.

### *Benghazi Attack Records*

Finally, Judicial Watch seeks to question both Secretary Clinton and Ms. Mills about "the preparation of talking points for former U.N. Ambassador Susan Rice's September 16, 2012 media appearances, the advance dissemination or discussion of those talking points, the aftermath of Rice's appearances, and the Department's evolving understanding of the Benghazi attack." Pl.'s Combined Reply 12–13. Judicial Watch argues that their answers will provide more information regarding the adequacy of State's search. *Id.* at 13.

Secretary Clinton specifically opposes this request. She argues that questioning her about the government's response to the Benghazi attack has no relevance to the underlying FOIA request and falls outside the parameters set forth in the Court's December 6, 2018, memorandum opinion and order authorizing discovery. Clinton Opp. Dep. 6. Additionally, she highlights the request as proof that Judicial Watch might seek to improperly expand the parameters of discovery if the Court permits Judicial Watch to depose her. *Id.* at 12–13 n.5.

The Court holds that Secretary Clinton and Ms. Mills cannot be questioned about the underlying actions taken after the Benghazi attack, but they may be questioned about their knowledge of the existence of any emails, documents, or text messages related to the Benghazi attack. Such inquiries would go to the adequacy of the search without expanding the parameters

of discovery to include the substance of the government's response to the attack. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** this request.

\*\*\*\*\*\*\*\*\*

The parties shall complete this round of discovery within seventy-five (75) days, unless they seek additional time. The Court will hold a post-discovery hearing to set a further schedule herein.

It is **SO ORDERED**.

Date:   March _2_, 2020

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge